WY Teton County District Court
9th JD
Jan 21 2025 05:53PM
Unassigned
75483278
**FILED**

FILED
01/21/2025 17:53:49
2025-CV-0019225
Filed By: Luisa Evans



Robert J. Walker (#7-4715)
Matthew A. Walker (#7-5737)
John M. Walker (#5-2224)
WALKER LAW, LLP
114 E. 7th Ave, Suite 200
PO Box 22409
Cheyenne, WY   82003
Telephone: (307) 529-2255
robert@wyocounsel.com
matthew@wyocounsel.com
john@wyocounsel.com

Counsel for the Plaintiff

# IN THE DISTRICT COURT OF THE NINTH JUDICIAL DISTRICT
## STATE OF WYOMING, COUNTY OF TETON

| | |
|---|---|
| AFG Companies, Inc.,           ) | |
|                        ) | |
|        *Plaintiff*,        ) | |
|                        ) | |
| v.                      ) | |
|                        ) | Case No. 2025-CV-_____ |
| GENUINE LIFETIME LLC, a Wyoming   ) | |
| Limited Liability Company; BRAND    ) | |
| ENGAGEMENT NETWORK INC., a Wyoming  ) | |
| for Profit Corporation, d/b/a/ BEN AI, d/b/a BEN,  ) | |
| f/k/a BLOCKCHAIN EXCHANGE NETWORK  ) | |
| INC.; OCTOBER 3ᴿᴰ HOLDINGS LLC, a    ) | |
| Wyoming Limited Liability Company; MICHAEL  ) | |
| LUCAS, individually; TYLER LUCK, Individually,) | |
| DUE FIGLIE, LLC, a Wyoming Limited Liability  ) | |
| Company, SHAWN LUCAS, individually,   ) | |
|                        ) | |
|        *Defendants*.      ) | |

---

## COMPLAINT

---

1

EXHIBIT 1

**COMES NOW**, the Plaintiff, AFG Companies Inc. ("AFG"), by and through its Counsel, Walker Law LLP, and for its Complaint, states and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      AFG is a company with its principal place of business in Grapevine, Texas.  AFG provides alternatives to finance and insurance products with extensive experience in the automotive industry.

2.      Genuine Lifetime is a Wyoming Limited Liability Company with its principal place in Jackson, Wyoming.

3.      BEN AI is a Wyoming for Profit Corporation with principal place of business is located in Jackson, Wyoming.

4.      October 3rd Holdings LLC ("October 3rd") is a Wyoming Limited Liability Company with its principal place of business in Cheyenne, Wyoming.  Upon information and belief, October 3rd owns an approximate 58% interest in Genuine Lifetime.  October 3rd is owned 50% by Tyler Luck and 50% by Michael Lucas.

5.      Tyler Luck ("Luck") is a co-founder of BEN AI and serves on its board as well as its chief product officer.  Luck is also the Managing Member of Genuine Lifetime.  Luck is a resident of Jackson, Wyoming.

6.      Michael Lucas is married to Luck, is also a co-founder of BEN AI, and is a consultant to BEN AI.  Michael Lucas is a resident of Jackson, Wyoming.

7.      Shawn Lucas was formerly a contractor for a subsidiary of AFG pursuant to a consulting agreement which commenced in late 2021.  In his role with AFG, Shawn Lucas provided advisory services to assist AFG with corporate advice, strategy, general mentoring, technology, product development, and legal and financial matters.

8.    Shawn and Michael Lucas are brothers.  Upon information and belief, Shawn Lucas is the Managing Member of Due Figlie LLC, a Wyoming LLC ("Due Figlie"), which is an entity that owned or owns shares in BEN AI.  Shawn Lucas formed Due Figlie in June of 2020 and serves as its Manager.   Shawn Lucas has substantial personal contact with Wyoming through his management of Due Figlie.

9.    Travis Gates ("Gates") was employed by AFG to oversee its subsidiary AFG Technologies.  Gates worked in this role from approximately October of 2013 through February of 2024.  Upon information and belief, Gates resides in an RV with his primary residence in Texas.

10.    This Court has jurisdiction as the primary places of business for BEN AI, October 3rd, and Genuine Lifetime are all in Wyoming.  Further, Luck and Michael Lucas are residents of Teton County, Wyoming.   Finally, many of the Parties' relevant agreements require that any disputes arising therefrom be brought in the state of Wyoming and be controlled by Wyoming law.

11.    Upon information and belief, the executive offices where the records relevant to this case would be stored are in Teton County, Wyoming.

12.    The foregoing individuals have purposely availed themselves of Wyoming law and have had minimum contacts with Wyoming as they are either residents of Wyoming or have substantial investments in or activities with Wyoming companies, and those investments and activities are at issue in the above-captioned matter.

13.    This dispute seeks injunctive relief and the amount in dispute exceeds the jurisdictional limits of this Court.

14.    Venue is proper within this Court as a majority of the activities, decisions, and records relating to the above-captioned matter are located within Teton County.

**FACTS COMMON TO PLAINTIFF'S CLAIMS FOR RELIEF**

15.    BEN AI has held itself out as an innovative AI platform provider designed to interface with emerging technologies, including blockchain, internet, and cloud computing.

16.    BEN AI holds itself out as offering a suite of configured and customizable applications including natural language processing, anomaly detection, encryption, recommendation engines, sentiment analysis, image recognition, personalization, and real-time decision-making.

17.    AFG was formed in 1997 due to a growing need in the automotive industry for superior alternatives to the finance and insurance ("F&I") products available to automotive companies including dealerships, agencies, automaker partners, and original equipment manufacturers ("OEM").

18.    For years, AFG and its subsidiaries have supplied advanced products, offering solutions to small and large automotive companies relating to F&I processes, technologies, and other development services.

19.    Today, AFG and its subsidiaries work with financial institutions, dealer groups, agencies, and individual dealerships throughout the country to provide not only the products and services above but also to develop custom software tailored to clients' automotive needs.

20.    In approximately May 2023 AFG was introduced to BEN AI through Shawn Lucas who was working with his brother, Michael Lucas, in both Genuine Lifetime and BEN AI.

21.    At that time, Shawn and Michael Lucas negotiated a letter of intent ("LOI") for the acquisition of AFG by DHC Acquisition Corp in the amount of $140 million dollars with additional incentives as part of BEN AI's pending merger with DHC.

22.    The acquisition of AFG did not materialize and the Lucas brothers pivoted their strategy for AFG to make an investment of $32.5M over 5 years into BEN AI in exchange for exclusive rights to resell BEN AI's products in the Automotive field.

23.    As part of those conversations, it was represented that BEN AI's technology was commercial market ready and they further asserted that their enabling patent portfolio had already been rigorously defined and tested, making it extraordinarily strong, referring to claimed successful litigation against Google.

24.    Further, Michael Lucas together with one or more of the other Defendants represented that the following companies relied on BEN AI's technology: Facebook, Apple, Samsung, Tesla, NXP, flex, AT&T, Amazon, Intel, GE, Philips, Nokia, Siemens, Verizon, Google, Ivideon, somfy, Netgear, OCO, and Simplife.

25.    Michael Lucas further represented that litigation against these companies for patent infringement provided a viable alternative approach to recover AFG's investment.

26.    Neither Michael Lucas nor any of the other Defendants disclosed to AFG that Michael was sentenced to 18 months in prison in or around 2022 for tax crimes relating to employment withholdings.

27.    Upon information and belief, Michael Lucas was ordered to pay approximately $4.9 million dollars in restitution for his tax related crimes.  Had such information been disclosed regarding one of BEN AI's cofounders and apparent principals, it would have significantly affected AFG's decision to invest in the company.

28.    On or about August 19, 2023, BEN AI entered into a five (5) year Exclusive Reseller Agreement with AFG ("Reseller Agreement").

29.    Within the Reseller Agreement, BEN AI agreed to issue shares of common stock to AFG.

30.    The Reseller Agreement contained an exclusivity clause requiring that BEN AI give AFG the exclusive right to use and resell BEN AI's services within the following fields: manufacturing, distributing, marketing, reselling and or repairing new and used motor vehicles, recreational vehicles, and power sports vehicles, and third party administrators that solely provide finance and insurance products, parts and service products, sales and marketing services, technology services, service contracts and/or warranties, in each instance for motor vehicles, recreation vehicles and power sports vehicles.

31.    This product was given a working project name of "BEN Auto."

32.    BEN AI further agreed to use commercially reasonable efforts to integrate their services into AFG's operations.

33.    Pursuant to the Reseller Agreement, AFG could not begin offering BEN AI services until they were of a reasonably quality similar to other commercial offerings.  BEN AI was required to provide support to these services at no additional charge.

34.    The Reseller Agreement only permitted BEN AI to terminate the Reseller Agreement if AFG failed to make required payments within 30 days; upon a material breach with a thirty (30) day cure period; or if either party became insolvent. To be clear, Plaintiff does not seek to specifically enforce or declare any of the rights or interest in the Reseller Agreement as part of the above-captioned matter.

35.    Shortly after securing the Reseller Agreement, on or about September 7, 2023, AFG entered into a first Subscription Agreement with BEN AI agreeing to purchase $6.5 million of BEN AI's common stock ("First Subscription Agreement").

36.    On September 29, 2023, AFG entered into a Subscription Agreement for Common Stock with BEN AI ("Second Subscription Agreement").

37.    As part of the Second Subscription Agreement, AFG agreed to purchase shares in BEN AI for one million dollars ($1,000,000), which would proportionally reduce the amount owed under the First Subscription Agreement.

38.    On September 29, 2023, AFG purchased 456,621 shares of Stock in BEN AI for $2.19 per share for the agreed upon aggregate purchase price of $1.0 million.

39.    As part of the First Subscription Agreement, AFG paid an additional $5,500,000 in March of 2024, fulfilling the full six million five-hundred thousand dollars ($6,500,000) commitment.

40.    At or around the time AFG was entering into these agreements with BEN AI, Shawn Lucas was assigned a role as a business developer in relation to the BEN Auto project.

41.    In addition to his role with the BEN Auto project, Shawn Lucas was also responsible for coordinating and managing the business relationships between AFG and Genuine Lifetime, Parts Protection, Southeast Toyota (SET), Auto Nation, Mercedes Benz, and BEN AI.

42.    On or about August 10, 2023, Shawn Lucas sent an email inquiring whether AFG had a cybersecurity insurance policy.

43.    On August 13, 2023—three (3) days later—AFG incurred an alleged ransomware attack.

44.    However, after immediate, substantial, and expensive expert third-party investigation, it was determined there was no exfiltration (i.e. theft or unauthorized removal or movement) of any of AFG's electronic information, including its customer information.

45.     AFG incurred approximately one million dollars ($1,000,000) in expenses in legal and cyber-attack response costs because of the ransomware attack, in addition to amounts paid by AFG's insurance provider.

46.     A review of AFG's systems shows that Shawn Lucas took sixteen (16) screenshots of sensitive and confidential internal electronic communications regarding AFG's immediate response to the alleged ransomware attack.

47.     During this same period, Travis Gates was President of AFG Technologies, Inc. and led AFG's internal response to the alleged ransomware attack.

48.     In relation to the BEN Auto project, Gates oversaw all technology development.

49.     In October of 2023, Shawn Lucas led a technology summit relating to BEN Auto. However, the summit did not go well and AFG removed Shawn Lucas from the project.

50.     AFG canceled Shawn Lucas' consulting agreement in March of 2024.

51.     On October 17, 2023, Genuine Lifetime and AFG entered into a Loan Agreement ("Loan Agreement").

52.     Prior to entering into the Loan Agreement, Defendants represented to AFG, *inter alia*, that:

  a.  BEN AI's patent portfolio had been rigorously defined and tested, making it extraordinarily strong;

  b.  BEN AI had litigated against Google, with favorable federal construction in Markman and IPR proceedings; and

  c.  Companies that rely on BEN AI technology included: Facebook, Apple, Samsung, NXP, flex, Verizon, AT&T, Amazon, Intel, GE, Phillips, Nokia, Siemens, Google, ivideon, Netgear, SimpliSafe, somfy, and Coco.

53.    As part of the Loan Agreement, Genuine Lifetime borrowed the sum of four million dollars ($4,000,000) at a 10% interest rate, per annum.

54.    The Loan Agreement required that the $4,000,000 only be used for the purpose of purchasing shares of BEN AI.

55.    The maturity date on the Loan Agreement was on or before the earlier of the one-year anniversary of the date of the Loan Agreement or the thirtieth (30th) day following the date as of which the BEN AI shares are traded on the NASDAQ stock market.

56.    As part of the Loan Agreement, Genuine Lifetime agreed to pay all reasonable costs and expenses incurred in collecting the obligation and reasonable attorney's fees and expenses related to the Loan Agreement.

57.    In return for the $4,000,000, October 3rd, the majority owner of Genuine Lifetime, agreed to execute a security agreement granting AFG a first priority lien on all assets of Genuine Lifetime.

58.    Substantial restrictive covenants were set forth within the Loan Agreement to protect AFG's ability to collect under the Loan Agreement should Genuine Lifetime fail to fulfill its obligations.

59.    The Loan Agreement required that any dispute thereunder be heard in Texas and apply Texas law.

60.    After receiving AFG's $4,000,000, Genuine Lifetime LLC purchased 1,826,484 shares of Legacy Common Stock at $2.19 per share for an aggregate purchase price of approximately $4.0 million.

61.     A prior lawsuit has been filed against Genuine Lifetime and Luck for defaulting on the Loan Agreement in Tarrant County, Texas.  In that matter, AFG is seeking damages in excess of $4.8 million.

62.     Luck, individually, also agreed to guarantee the complete payment of the loan and the performance of the Loan Agreement by executing a Personal Guaranty of Payment to AFG Companies Inc. ("Personal Guarantee").

63.     Luck's guarantee expressly required that he irrevocably and unconditionally guarantee the prompt payment and performance of the guaranteed debt as set forth within the Loan Agreement.  Luck agreed to be liable for all interest, fees, indemnities, and other costs and expenses relating to or arising out of the guaranteed debt.

64.     Also on October 17, 2023, Luck and AFG entered into a valid and binding Lock-Up Agreement ("Lock-Up Agreement") relating to the BEN AI shares to be acquired by Genuine Lifetime.

65.     Within the Lock-Up Agreement, Luck generally agreed that he would not directly or indirectly convey any of the BEN AI stock owned by Genuine Lifetime so long as amounts were owed to AFG pursuant to the Loan Agreement.

66.     The Lock-Up Agreement again requires that any action in relation thereto be brought in the Federal District Court of Wyoming or the Wyoming State District Court in Teton County.

67.     Also on October 17, 2023, Genuine Lifetime and AFG entered into a valid and binding Security Agreement ("Security Agreement").

68.     The Security Agreement is unambiguous and sets forth the duties and obligations of AFG and Genuine Lifetime.

69.     As Grantor under the Security Agreement, Genuine Lifetime agreed to grant a lien on certain collateral which included all of Genuine Lifetime's assets and any proceeds and products of any of Genuine Lifetime's assets and any tangible or intangible property received upon the sale or disposition of any of its assets (the "Collateral").

70.     As set forth above, the primary asset of Genuine Lifetime to be secured under the Security Agreement was the Collateral (i.e. the $4,000,000 in shares it was to acquire in BEN AI).

71.     The Security Agreement expressly states that Genuine Lifetime was irrevocably, until all obligations were paid, designating AFG its attorney-in-fact with full authority to "take any action and to execute on any instrument which the Secured Party may deem necessary or advisable."

72.     The Security Agreement also stated that it shall be exclusively construed and enforced in accordance with the laws of the state of Wyoming, with any proceeding in relation to the Security Agreement being brought in a Court of the State of Wyoming or the Federal District Court for the state of Wyoming.

73.     Over the following months, representations were made about the pending deliverables from BEN AI on the BEN Auto project – none of which were ever actually provided.

74.     For example, in October of 2023, BEN AI represented to AFG, through Paul Chang, that their technology is closer to ready than we think and that each use case was one to two weeks from a turnaround time.

75.     Also in the months following execution of the Reseller Agreement, BEN AI has gone through major leadership changes, including at its highest levels.

11

76. In November of 2023, BEN AI represented to AFG, through Michael Zacharski, that BEN AI would be showcasing their ability to integrate IBM's technology including WatsonX and DB2.

77. That same month, BEN AI encouraged Travis Gates to resign from AFG for incentives they promised to provide him upon BEN AI going public.

78. In March of 2024, BEN AI took its business public.

79. That same month, a letter was sent directly to the majority of AFG's customers falsely alleging that AFG experienced a data breach. Upon information and belief, Shawn Lucas was directly assisting with the preparation of the letter.

80. Included in the email were the screenshots taken by Shawn Lucas, proprietary company information that only he could have created.

81. Gates resigned from AFG shortly thereafter, wiping his laptop and deleting all emails from May of 2023 through September of 2023.

82. A short time later, upon information and belief, Gates received some form of incentive from BEN AI for leaving AFG.

83. Despite these issues and AFG's substantial concerns with the lack of deliverables, in January of 2024, AFG was dedicated to the Reseller Agreement and set the following expectations that:

    a. A Joint Development Team would be collocated at AFG's facility in Grapevine, Texas;

    b. Development must be collocated to succeed;

    c. BEN AI would relocate their key South Korean developers to Texas; and

d. BEN AI's employees would work with AFG's teams to purposely design a collaborative workspace, with AFG paying for the cost of that workspace;

84. In approximately Spring of 2024, AFG was informed by both the Chairman of the Board, an additional Board member, and the CEO, Michael Zacharski, of BEN AI, a now public company, that Michael Lucas disparaged Wright Brewer and AFG to BEN AI's Board of Directors.

85. In April of 2024, Genuine Lifetime defaulted on the Loan Agreement.

86. A very short time later, Luck, Gates, Shawn Lucas, and Michael Lucas incited BEN AI to begin investigating AFG for the cyberattack that occurred mere days after Shawn Lucas inquired whether AFG had cyber insurance and while Gates and Shawn Lucas were overseeing much of AFG's information technology systems.

87. Despite its many representations and duties under the Reseller Agreement, BEN AI has failed to provide AFG any deliverables.

88. None of the promised deliverables have worked as represented or were never completed, and it has become clear BEN AI always lacked the capacity to perform its obligations under the Reseller Agreement.

89. Despite BEN AI's representations, IBM never integrated with the BEN AI products, the consequences of which were never directly disclosed to AFG regarding the commercial readiness of BEN AI's technology.

90. BEN AI continued to not make any progress on the project throughout March and April of 2024.

91. By May of 2024, BEN AI also had still not sent any developers to Grapevine, Texas as promised.

92.     BEN AI subsequently hired and sent two new developers to Grapevine, Texas, but removed them approximately one month later with no progress on the project.

93.     AFG eventually required that BEN AI provide a working demo that met the promised specifications by July 3, 2024 as proof of concept and viable product.

94.     BEN AI did not, and still has not, provided any proof of concept or of a viable working product.

95.     Upon information and belief, Genuine Lifetime, Luck, and BEN AI are intentionally engaging in actions to sell the BEN AI stock that is securing AFG's substantial payment to Genuine Lifetime for the purchase of that stock, in violation of the foregoing agreements.

96.     Further, upon information and belief, BEN AI and its principals have engaged in stock splitting or similar release of new stock, intentionally diluting AFG's investments.

97.     Despite its own substantial material failures, on January 17, 2025, BEN AI sent AFG a letter indicating that it was terminating the Reseller Agreement.

98.     BEN AI did not provide 30 days to cure any alleged problems or concerns.

99.     The reason BEN AI gave for terminating the Reseller Agreement was the cyberattack aimed at AFG's systems occurring mere days after Shawn Lucas inquired whether AFG had cyber insurance.

### FIRST CAUSE OF ACTION AGAINST DEFENDANTS GENUINE LIFETIME AND OCTOBER 3RD HOLDINGS: -BREACH LOCK-UP AGREEMENT, and SECURITY AGREEMENT-

100.    Plaintiff, AFG, incorporates herein by this reference paragraphs 1 through 99 of this Complaint as if set forth fully herein.

14

101.    The Lock-Up Agreement constitutes a binding contract between AFG and Luck, both individually and in his role as Managing Member of Genuine Lifetime.

102.    The Security Agreement constitutes a binding contract between AFG and Genuine Lifetime and October 3rd Holdings.

103.    Genuine Lifetime failed to pay the amount required under the Loan Agreement prior to or by its Maturity Date.

104.    Genuine Lifetime has therefore defaulted on the Loan Agreement.

105.    Upon information and belief, Luck and Genuine Lifetime have failed to comply with the terms of the Lock-Up Agreement and are allowing Genuine Lifetime's assets to be sold, including shares it owns in BEN AI.

106.    Despite requests, Genuine Lifetime and October 3rd Holdings are refusing to turn over Genuine Lifetime's assets as is required by the Security Agreement, and Luck has refused to pay the debt he personally guaranteed.

107.    As a result of the foregoing breaches by Genuine Lifetime, Luck, and October 3rd, Plaintiff has incurred damages, including the approximate $4.8 million on the defaulted Security Agreement in addition to those harms caused by the breaches to the Lock-Up agreement.

108.    Plaintiff, AFG, is further entitled to all fees and costs associated with executing on the defaulted Security Agreement and Personal Guarantee.

**SECOND CAUSE OF ACTION AGAINST DEFENDANTS
GENUINE LIFETIME, TYLER LUCK, AND OCTOBER 3RD HOLDINGS:
-BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING-**

109.    Plaintiff, AFG, incorporates herein by this reference paragraphs 1 through 108 of this Complaint as if set forth fully herein.

110. The implied covenant of good faith and fair dealing requires that no party commit an act that would injure the rights of the other party to receive the benefit of their agreement.

111. Plaintiff AFG complied with the provisions of the Personal Guarantee, Security Agreement, and Lock-Up Agreement.

112. AFG paid Genuine Lifetime $4,000,000 in relation to the Security Agreement, Personal Guarantee, and Lock-Up Agreement, which required repayment of the principal amount plus interest accrued by the maturity date.

113. As set forth above, Genuine Lifetime, Tyler Luck, and October 3rd Holdings have breached the covenant of good faith and fair dealing by undertaking activities and actions to undermine AFG and impair its ability to timely and reasonably collect on the Personal Guarantee and Security Agreement.

114. Upon information and belief, Genuine Lifetime, Luck, and/or October 3rd are actively trying to sell the BEN AI stock held by Genuine Lifetime that is secured by the Security Agreement.

115. Upon information and belief, Genuine Lifetime, Luck, and/or October 3rd are conspiring with each other to impede AFG's ability to be paid any of its $4,000,000 investment.

116. As a result of the breach of the covenant of good faith and fair dealing, Plaintiff AFG has not yet received any benefits under the various agreements relating to its substantial payment to Genuine Lifetime.

117. Plaintiff AFG has suffered substantial harm through Defendant's unlawful actions and it is entitled to a judgment of no less than the full collateralized debt owed by Genuine Lifetime in the amount of $4.8 million dollars and all additional costs and attorney fees incurred in protecting its rights in the Personal Guarantee, Security Agreement, and Lock-Up Agreement.

**THIRD CAUSE OF ACTION AGAINST DEFENDANTS
GENUINE LIFETIME AND OCTOBER 3RD HOLDINGS:
-UCC FORECLOSURE ON COLLATERAL OF BEN AI STOCK-**

118.   Plaintiff, AFG, incorporates herein by this reference paragraphs 1 through 117 of this Complaint as if set forth fully herein.

119.   Pursuant to W.S. § 34.1-9-601, after default a secured party has the right to reduce a claim to judgment, foreclose, or otherwise enforce a security interest by any available judicial procedure.

120.   At the time of the filing of this Complaint, stock in BEN AI is trading at approximately 63 cents ($0.63) per share.

121.   Genuine Lifetime purchased 1,826,484 shares of BEN AI stock and has pledged those shares as security under the Security Agreement.  Genuine Lifetime further pledged all its assets as security in relation to AFG's $4,000,000 loan.

122.   Given that it appears the secured shares in BEN AI are worth substantially less than the $4,000,000 owed by Genuine Lifetime, AFG requests that the Collateral be sold with all proceeds paid to AFG pursuant to the Security Agreement, with AFG expressly retaining and reserving any rights it may have against Genuine Lifetime, Tyler Luck, and October 3rd Holdings for any deficiency.

**FOURTH CAUSE OF ACTION AGAINST DEFENDANTS
GENUINE LIFETIME, OCTOBER 3rd HOLDINGS,
MICHAEL LUCAS, SHAWN LUCAS, TYLER LUCK, and DUE FIGLIE:
-UNJUST ENRICHMENT-**

123.   Plaintiff, AFG, incorporates herein by this reference paragraphs 1 through 122 of this Complaint as if set forth fully herein.

124.   Michael Lucas, Luck, Shawn Lucas, Genuine Lifetime, October 3rd, and Due Figlie stood to gain a substantial benefit from AFG's investment in BEN AI.

125. Michael Lucas and Luck are BEN AI's cofounders, and each owns a 50% interest in October 3rd Holdings. October 3rd owns 58% of Genuine Lifetime. Genuine Lifetime received $4,000,000 to acquire BEN AI stock.

126. Due Figlie is known to be owned by Shawn and/or Michael Lucas, and is primarily managed by Shawn Lucas. Upon information and belief, Due Figlie has a substantial financial stake in BEN AI and benefitted from AFG's substantial direct investments into BEN AI as well as from AFG's loan to Genuine Lifetime.

127. Michael Lucas and Luck both benefited from AFG's substantial loan to Genuine Lifetime as that allowed it to capitalize BEN AI, the company they founded. Without that investment, Michael Lucas, Shawn Lucas, and Luck's direct and indirect interests in BEN AI, October 3rd, Due Figlie, and Genuine Lifetime would have been worth substantially less.

128. AFG's investments into Genuine Lifetime and BEN AI, in conjunction with the Reseller Agreement, provided BEN AI with the foundation it needed to go public with an increased offering price.

129. Michael Lucas, Luck, Genuine Lifetime, and October 3rd accepted the various agreements that would infuse capital into the companies while giving AFG the exclusive Reseller Agreement that would allow AFG to profit from the development of BEN Auto.

130. Under the Reseller Agreement, AFG expected to be able to get paid from the development of BEN Auto, something that the foregoing entities prevented. AFG further expected to be paid back for its substantial loan of $4,000,000 pursuant to the Personal Guarantee and Security Agreement.

131.    AFG would not have signed any of the foregoing agreements in isolation, and it was through the agreements, in tandem, that AFG anticipated it would be paid for its services and invesements.

132.    It would be inequitable for Michael Lucas, Luck, Genuine Lifetime, and October 3rd to conspire to terminate the Reseller Agreement while directly benefiting from their overlapping dealings with AFG, knowing AFG's primary benefit from its investment would come from being able to later co-develop and sell BEN Auto's products.

133.    BEN AI would be unjustly enriched if it were allowed to receive all the benefits of AFG's agreements and substantial investments while failing to perform on its primary obligation to AFG.

134.    AFG has incurred substantial harm including the loss of all anticipated future payments from BEN Auto, in amounts to be proven at trial.

**FIFTH CAUSE OF ACTION AGAINST DEFENDANTS
LUCK, SHAWN LUCAS, DUE FIGLIE, and MICHAEL LUCAS:
-TORTIOUS INTERFERENCE WITH A CONTRACT-**

135.    Plaintiff, AFG, incorporates herein by this reference paragraphs 1 through 134 of this Complaint as if set forth fully herein.

136.    Plaintiff AFG has valuable, valid, and enforceable contractual relationships with BEN AI, Genuine Lifetime, and October 3rd Holdings.

137.    Luck, Gates, Shawn Lucas, and Michael Lucas were all individually aware of the substantial business dealings between AFG, its affiliates, and BEN AI and Genuine Lifetime.

138.    Gates and Shawn Lucas had particularized knowledge of AFG's business dealings and procedures as they worked for AFG at the time it began its business dealings with BEN AI.

19

139.    Shawn Lucas solicited AFG for investment in BEN AI without disclosing his personal interests in Due Figlie, a company with substantial interests in the future success of BEN AI, and he prioritized the success of BEN AI over his duties to AFG.

140.    Michael Lucas, a co-founder of BEN AI, is brothers with Shawn Lucas and, upon information and belief, used that relationship to gather information from AFG that could be used to harm and interfere with its business dealings with BEN AI, including the Reseller Agreement.

141.    Upon information and belief, Gates and Shawn Lucas were made promises by Luck and/or Michael Lucas if they would interfere with AFG's relationship with BEN AI.

142.    Upon information and belief, Shawn Lucas, Luck and Gates all participated in providing confidential and proprietary AFG communications to Luck and Michael Lucas for the purpose of using that information to compel BEN AI to terminate the Reseller Agreement.

143.    Michael Lucas has personally made disparaging remarks to BEN AI's board about AFG despite being one of the primary individuals conspiring to encourage AFG's investments and using his brother Shawn Lucas's role within AFG to secure the investment.

144.    BEN AI has now terminated the exclusive Reseller Agreement, preventing AFG from receiving any of the expected benefits under the Reseller Agreement.

145.    The termination of the Reseller Agreement is the direct result of the unlawful, deceitful, and defamatory actions of Luck, Due Figlie, and Michael Lucas, including through their conspiring with Shawn Lucas and Gates.

146.    Upon information and belief, Luck, Shawn Lucas, and Michael Lucas have also influenced and encouraged Genuine Lifetime to not honor its Securities Agreement.

147.    Plaintiff AFG has incurred substantial damage as a result of Defendants' unlawful interference with AFG's contractual relationships as will be proven at trial.

## SIXTH CAUSE OF ACTION AGAINST DEFENDANTS
## GENUINE LIFETIME, OCTOBER 3RD, TYLER LUCK, SHAWN LUCAS
## DUE FIGLIE and MICHAEL LUCAS:
## -CIVIL CONSPIRACY TO COMMIT FRAUD-

148.    Plaintiff, AFG, incorporates herein by this reference paragraphs 1 through 147 of this Complaint as if set forth fully herein.

149.    As set forth above, Michael Lucas, Luck and the entities they oversee, either directly or indirectly (i.e. Genuine Lifetime and October 3rd) have conspired to undertake unlawful actions to compel Plaintiff AFG to make substantial investments into BEN AI and Genuine Lifetime, while knowing that they would not be able to provide any of their promised deliverables or repay the money they voluntarily sought to capitalize their companies.

150.    It is unlikely that BEN AI could have completed its public offering or a merger without AFG's substantial investment and support.

151.    Upon information and belief, when Genuine Lifetime entered into the Security Agreement, it already knew that it would not repay the loan from AFG and began a plot to find a way out of honoring its substantial obligations to the detriment of AFG.

152.    The goal of the Defendants was always to take AFG's money for Defendants' personal gain without giving anything of value in return.

153.    Michael Lucas, Shawn Lucas, and Luck knew that AFG was relying on the Reseller Agreement as the primary means by which it could recoup and eventually make a profit on its investments.

154.    Shawn Lucas used his role within AFG, ignoring his conflicting loyalties, to share information with Luck, Michael Lucas, Due Figlie, Gates, and BEN AI to the detriment of AFG. Shawn Lucas further conspired with Gates to use their roles within AFG to undermine AFG's

21

interests in the Reseller Agreement. Upon information and belief, this was all done under the direction of Michael Lucas and Luck.

155. Michael Lucas and Luck also knew that they had overstated BEN AI's ability to deliver a functioning BEN Auto product, and that its patents were being significantly devaluated by other similar products.

156. Michael Lucas also know that his status as having been convicted of tax crimes would dramatically affect AFG's willingness to invest, and for that reason the Defendants intentionally concealed his background.

157. Shawn Lucas and Due Figlie also intentionally failed to disclose the conflict of interest and personal stake they had in the success of BEN AI at the same time they were working with Michael Lucas and Luck to solicit investment from AFG.

158. BEN AI knew its developers could not meet AFG's timeline or expectations for a functional product.

159. Shawn Lucas conspired with Gates to use their roles with AFG to interfere with AFG's ability to benefit from the Reseller Agreement, including the sharing of proprietary information.

160. Nevertheless, while BEN AI was still bound under the exclusive Reseller Agreement, upon information and belief, Luck and others he conspired with began developing, or attempting to develop, a distinct automotive and insurance related product in violation of the Reseller Agreement, knowing their actions undermined BEN AI's contractual obligations to AFG.

161. As set forth above, Shawn Lucas and Gates were also intentionally used by Luck and Michael Lucas, while they worked directly with AFG, to take advantage of a targeted cyberattack as a preplanned and pretextual reason for terminating the Reseller Agreement. Shawn

Lucas and Gates cooperated with the other Defendants to undermine the Parties overlapping agreements and the overarching plan to develop BEN Auto.

162.    Upon information and belief, Shawn Lucas and Gates, upon the direction of Luck and Michael Lucas, conspired to destroy all of Gate's emails from at and around the time of the conspiracy.

163.    Upon information and belief, while under the direction of Luck and Michael Lucas, Shawn Lucas and Gates used their knowledge of the AFG infrastructure and confidential and proprietary information to undermine AFG's interests while simultaneously working directly with and for AFG.

164.    Shawn Lucas being the brother of Michael Lucas and brother-in-law to Luck, while also working with AFG, was uniquely situated to further a plan to seek substantial investment from AFG while simultaneously planning with the others to find an exit strategy from the Reseller Agreement.

165.    Luck and Michael Lucas further interfered with AFG's operations by compelling Gates, an individual with substantial responsibility over AFG's technologies, to leave AFG during critical times in a further attempt to interfere with the BEN Auto project.  Shawn Lucas was also subsequently terminated.

166.    Luck, Shawn Lucas, and Michael Lucas further conspired to defame AFG through the spreading of lies relating to the cyber-attack that occurred three days after Shawn Lucas inquired as to cyber-insurance, and then encouraged BEN AI to use these lies to breach the Reseller Agreement.

167.    Upon information and belief, prior to terminating the Reseller Agreement, Luck, Michael Lucas, and their co-conspirators had been actively working with other providers in the

automotive and/or insurance industries to develop products specifically related to those protected by the Reseller Agreement while BEN AI was still unarguably bound by that agreement.

168.    The only reason given for the termination of the Reseller Agreement was the targeted cyberattack that occurred days after Shawn Lucas inquired about cyber-insurance, with no evidence of exfiltration – using surreptitious screenshots taken by Shawn Lucas to support their claim.

169.    The cyberattack is merely a pretextual reason, as AFG informed BEN AI that its systems meet or exceed industry standards for cybersecurity and that during the targeted attack there was no proof that any information was ever any exfiltration of data.

170.    As a proximate cause of the co-conspirators' joint actions and plan, AFG was fraudulently induced into foregoing other investment opportunities and investing millions of dollars into BEN AI and Genuine Lifetime, when Defendants knew there would never be any return on that investment.

171.    Rather, all Defendants directly benefited from the conspired plan to defraud AFG.

172.    AFG has suffered substantial damages in the amount of its investments into the Defendants' scheme, as well as all its costs and attorneys' fees necessary to protect its interests, along with all its substantial costs in addressing the targeted cyber-attack believed to have been orchestrated or facilitated as part of the conspiracy.

173.    Further, AFG should be awarded punitive damages from Genuine Lifetime, October 3rd, Tyler Luck, Shawn Lucas, Due Figlie, and Michael Lucas, jointly and severally, for their intentional, targeted, and planned attack to defraud AFG out of millions of dollars.

**SEVENTH CAUSE OF ACTION AGAINST DEFENDANTS**
**GENUINE LIFETIME, OCTOBER 3RD, TYLER LUCK, SHAWN LUCAS,**
**DUE FIGLIE, and MICHAEL LUCAS:**
**-FRAUD AND CONSTRUCTIVE FRAUD-**

174.    Plaintiff, AFG, incorporates herein by this reference paragraphs 1 through 173 of this Complaint as if set forth fully herein.

175.    As more fully set forth above, Defendants all employed a joint scheme to defraud Plaintiff AFG of its substantial monetary investment into Genuine Lifetime and BEN AI.

176.    BEN AI, Genuine Lifetime, and October 3rd held out Luck and Michael Lucas as their reliable and trustworthy agents.

177.    As set forth above, Luck and Michael Lucas made various representations regarding BEN AI that were either not true or that were so overstated as to make the context in which they were made misleading, including the companies that BEN AI contracted with and what was possible with their products.

178.    Defendants intentionally withheld relevant information regarding Michael Lucas's background relating to crimes involving honesty of character, resulting in an order of restitution of approximately $4.9 million dollars.

179.    Defendants further used Shawn Lucas and Gates as their "insiders" to conspire within AFG to further their own ends, without disclosing the personal stake Shawn Lucas had, individually and through Due Figlie, in the success of BEN AI.

180.    Prior to Plaintiff's investment, AFG was assured an exclusive Reseller Agreement of BEN AI's product in the automotive field.  That Reseller Agreement imposed numerous obligations on BEN AI relating to its cooperation in providing a market-ready product.

181.    Defendants knew Plaintiff was unaware of their close relationships and loyalties to each other.

25

182. All Defendants knew that Plaintiff AFG was unaware of Michael Lucas's substantial legal issues.

183. Gates and Shawn Lucas specifically knew that AFG was unaware of their loyalty to BEN AI and the other Defendants during those times in which they were employed by AFG.

184. Gates and Shawn Lucas agreed to accept specific responsibilities in relation to the BEN Auto project, knowing that AFG was unaware of their undisclosed communications and personal dealings with Ben AI, Michael Lucas, Luck, Genuine Lifetime, Due Figlie, and October 3rd.

185. Gates and Shawn Lucas conspired to delete any incriminating emails from AFG's systems at times when they were at least partially responsible for those systems.

186. BEN AI, Michael Lucas, Luck, and Genuine Lifetime had substantial information regarding their inability to meet the obligations under their various agreements with AFG at the time they entered into those agreements.

187. Despite AFG's substantial investment in BEN AI directly and indirectly through Genuine Lifetime, Defendants have intentionally interfered with AFG's ability to receive any benefit from those dealings.

188. Upon information and belief, it was always Defendants' intentions to take as much financially from AFG as they could, and as soon as AFG demanded proof of concept or some form of deliverable market ready product that could be resold, BEN AI terminated the Reseller Agreement.

189. Gates and Shawn Lucas were directly involved in overseeing AFG's cybersecurity at the time of the ransomware attack, which BEN AI is now using as the reason for terminating the Reseller Agreement.

190.    Upon information and belief, Defendants were directly involved in the cyberattack on AFG, and they then used that scheme to disparage Plaintiff to its clients.

191.    Upon information and belief, substantial sums have been paid either directly or indirectly to Gates, Shawn Lucas, Luck, and Michael Lucas for their involvement in encouraging Plaintiff to invest in BEN AI.

192.    Upon further discovery Plaintiff believes the evidence will show that rather than using AFG's substantial investment to actively develop a working product, Gates, Shawn Lucas, Luck, and Michael Lucas, as well as BEN AI's owners, indirectly received a large portion of those funds as salaries, bonuses, and payoffs, beyond industry standards.

193.    Further, upon information and belief, Luck was actively working to find other developers in the automotive and insurance industries for BEN AI at a time when he knew that BEN AI was bound under the Reseller Agreement.

194.    BEN AI's non-existent deliverables under the Reseller Agreement make clear that there was never any intention to assist AFG in developing BEN Auto or developing a product that could be resold.

195.    AFG relied on Defendants, and their representations, in deciding to enter into the various agreements set forth above.

196.    AFG's reliance on the truthfulness and completeness of Defendants' disclosures induced it to invest millions of dollars into BEN AI.

197.    Plaintiff, AFG, has suffered substantial damages in the amount of its investments into the Defendants' scheme, as well as all its costs and attorneys' fees necessary to protect its interests, along with all its substantial costs in addressing the targeted cyber-attack believed to have been orchestrated or facilitated as part of the Defendants' conspiracy.

198.    Further, AFG should be awarded punitive damages from Defendants, jointly and severally, for their intentional, targeted, and planned attack to defraud AFG out of millions of dollars.

**EIGHTH CAUSE OF ACTION AGAINST DEFENDANTS
GENUINE LIFETIME, LUCK, BEN AI, OCTOBER 3RD HOLDINGS,
and MICHAEL LUCAS:
-SECURITIES FRAUD PURSUANT TO W.S. § 17-4-501-**

199.    Plaintiff, AFG, incorporates herein by this reference paragraphs 1 through 197 of this Complaint as if set forth fully herein.

200.    It is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly:

  i.   to employ a device, scheme or artifice to defraud;

  ii.  to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

  iii. to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit on another person.

201.    As set forth above, Defendants gave numerous untrue statements about their ability to deliver a functioning product as part of the BEN Auto project.

202.    As set forth above, Defendants withheld critical information from Plaintiff AFG that they knew would materially impact its willingness to invest in BEN AI.

203.    As set forth above, Luck, BEN AI, Genuine Lifetime, and October 3rd orchestrated a plan for Plaintiff AFG to loan Genuine Lifetime, a company in which October 3rd was the majority controlling member, $4,000,000.  Upon information and belief, Michael Lucas and Luck are the individuals who oversaw and directed October 3rd and therefore Genuine Lifetime.

28

204.    Genuine Lifetime was to exclusively use those funds to acquire stock in BEN AI, which would then be pledged as collateral under the Security Agreement.

205.    In making this investment, all Parties were aware that AFG was relying on the overlapping agreements that would make AFG the exclusive reseller of BEN AI's products in the automotive and insurance industries.

206.    All the Parties were similarly aware that the Reseller Agreement was being offered to AFG in return for its substantial investment and contributions.

207.    Upon information and belief, the Defendants intentionally manipulated the market price using its fraudulent scheme against the Plaintiff, wherein Genuine Lifetime agreed to use AFG's money to acquire BEN AI stock while never intending to pay AFG back under the related Securities Agreement.

208.    Defendants intentional use and manipulation of Genuine Lifetime's acquisition of stock was purposely fraudulent as Genuine Lifetime currently has ownership of stock it did not pay for, while AFG has expended $4,000,000 for the stock Genuine Lifetime refuses to assign over.

209.    Without this fraudulent investment scheme, the price of the stock AFG directly purchased in BEN AI through its subscription agreement would have been substantially lower.

210.    Upon information and belief, Genuine Lifetime's purchase of BEN AI stock at an unsupportable and inflated value was intentional as to limit the amount of control and ownership AFG would be given in BEN AI.

211.    Additionally, it was never disclosed that Michael and Shawn Lucas's company, Due Figlie LLC, had a substantial interest in BEN AI while Shawn Lucas was still employed by AFG.

29

This was a substantial conflict of interest in light of Shawn Lucas's involvement in directing AFG's activities in relation to the BEN Auto project.

212.    BEN AI further made misrepresentations throughout its business dealings with AFG to conceal its own inability to meet its deliverables, and it used Gates and Shawn Lucas to create a pretextual alleged problem to try and justify an early termination of the Reseller Agreement.

213.    Further, it was never disclosed to AFG that Defendants were planning to orchestrate a stock split or issuance of new stock, after AFG's investment, that would dilute the shares and dramatically reduce the value of its investment.  Upon information and belief, this was always part of the Defendants' plan to defraud AFG for their own personal gain.

214.    Upon information and belief, other substantial misleading statements were made in BEN AI's SEC filings.

215.    Upon information and belief, Michael Lucas's tax crimes were never disclosed to the SEC, despite the fact that, upon information and belief, he indirectly owned substantial shares in BEN AI through various business entities.

216.    The Defendants further engaged in acts, practices, and courses of business that operated as a fraud and deceit upon Plaintiff, including what appear to be inaccurate or incomplete representations as to the products that its technology was capable of providing; the value of its patents in light of competitive products on the marketplace, information regarding their personal relationships and loyalties that created conflicts of interest; and ultimately BEN AI's termination of the Reseller Agreement, knowing that would cut off Plaintiff's ability to recover anywhere close to what it invested in Ben AI and Genuine Lifetime.

217.   The Defendants further omitted material information in their business dealings with AFG, including their personal relationships and loyalties as well as their logistical problems, including the many problems they were having with hiring South Korean engineers with the related language barriers and substantial difference in time zone.

218.   BEN AI has further failed to communicate and inform Plaintiff of substantial transactions and sales of shares within the Company subsequent to Plaintiff's investment, in further violation of its obligations to Plaintiff.

219.   Pursuant to W.S. § 17-4-509, Plaintiff AFG is entitled to a return of the consideration it paid directly for shares in BEN AI, as well as those sums paid to Genine Lifetime, plus interest at six percent (6%) per year from the date of purchase plus reasonable attorney fees.

**NINTH CAUSE OF ACTION AGAINST DEFENDANTS**
**BEN AI, GENUINE LIFETIME, TRAVIS LUCK, AND OCTOBER 3RD HOLDINGS:**
**-INJUNCTIVE RELIEF-**

220.   Plaintiff, AFG, incorporates herein by this reference paragraphs 1 through 219 of this Complaint as if set forth fully herein.

221.   Pending the resolution of the above-captioned matter, Genuine Lifetime, Luck, and October 3rd Holdings must be constrained from selling the Collateral of Ben AI Stock held by Genuine Lifetime pursuant to the terms of the Security Agreement.

222.   Further, pursuant to W.S. §§ 1-28-101 et. seq. this Court should enjoin the Defendant Companies from selling or otherwise distributing any of the Companies' assets outside the course and scope of its ordinary business activities pending the resolution of this litigation in light of the substantial amounts in dispute and the egregious and fraudulent behavior of the Defendants.

223.    Plaintiff BEN AI should further be restrained from any stock splits or other actions that would devalue or dilute Plaintiff's shares in BEN AI.

224.    Plaintiff AFG also requests the Court order that Defendants stop spreading information regarding AFG's information technology systems, which allegations are untrue and defamatory.

**TENTH CAUSE OF ACTION AGAINST DEFENDANTS
BEN AI, TRAVIS LUCK, SHAWN LUCAS, AND MICHAEL LUCAS:
-BUSINESS DEFAMATION and BUSINESS DEFAMATION PER SE-**

225.    Plaintiff, AFG, incorporates herein by this reference paragraphs 1 through 224 of this Complaint as if set forth fully herein.

226.    On or about January 17, 2025, BEN AI released a statement out of its Jackson, Wyoming office stating that AFG concealed a ransomware attack on its network shortly before the Reseller Agreement was executed.

227.    The statement further explains that its customer data and/or systems were not impacted, implying that AFG's customer data and systems were impacted.

228.    BEN AI further states that it has "zero tolerance" for actions that undermine trust, tying the statement to AFG's data security and their reason for terminating the AFG Reseller Agreement.

229.    Upon information and belief, Defendants have made other statements indicating that AFG failed to protect its customers' information.

230.    BEN AI's statements appear to be repeated from allegations made by Luck, Shawn Lucas, and Michael Lucas.

231.   Upon information and belief, BEN AI, Luck, Shawn Lucas, and Michael Lucas have made similar statements directly to numerous individuals and businesses, with the intended purpose of discouraging those that receive the information from doing business with AFG.

232.   These statements were made at a time when BEN AI, Shawn Lucas, Luck, and Michael Lucas had been informed and all knew that despite the alleged "cyber-attack" there was no exfiltration of AFG's customer or company data.

233.   AFG spent over one million dollars to investigate the alleged attack and to ensure that its systems were always safe.  If anything, the alleged attack was a successful test of AFG's cyber-security systems, processes, and response protocols, demonstrating that AFG's security meets or exceeds industry standards.

234.   Upon information and belief, Shawn Lucas, and those with which he was conspiring, were directly involved in the cyber-attack as it occurred only three days after he inquired whether AFG had cyber-insurance.  The allegations are akin to "victim-blaming" by the individual suspected of the attack.

235.   Allegations of insufficient security protections within AFG are extremely detrimental to operations within a business field that relies heavily on information security. Further, such allegations imply that AFG is out of compliance with Federal and or state regulations for the protection of such data.

236.   The statements by BEN AI, Shawn Lucas, Michael Lucas, and Luck were knowingly false, and were shared with actual malice.  BEN AI knew it had to find some pretextual reason for unlawfully breaching the Reseller Agreement, and these defamatory statements are the foundation of that conspiracy.

237.    Plaintiff has incurred substantial damage to its business reputation because of the intentionally false statements that were made about what was actually a successful test proving the opposite of what is implied by Defendant's statements and publications.

## DAMAGES

238.    Plaintiff AFG is entitled to more than $4.8 million in damages on the defaulted Security Agreement.

239.    Plaintiff is entitled to more than $6 million in damages as a result of the Defendant's targeted fraudulent scheme to encourage AFG to invest in BEN AI in conjunction with a Reseller Agreement while Defendants knew BEN AI could and would not meet the terms of that agreement.

240.    Plaintiff is entitled to the $1,000,000 or more that it incurred as a direct result of the cyber-attack that occurred three days after Shawn Lucas inquired whether AFG had cyber-insurance.  This is the same attack that Defendants are now using as pretext for why BEN AI should not be required to meet its obligations.

241.    Plaintiff is entitled to Damages for the Definition of its business, and specifically its information technology systems, which are critically important in the automotive and insurance fields.

242.    Plaintiff is entitled to punitive damages for Defendants' willful and intentionally harmful actions, including their securities fraud and related conspiracy to commit fraud as well as its defamation.

243.    Plaintiff is entitled to all its attorney fees and costs in pursuing this matter.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff AFG prays that the Court enter an Order and Judgment against Defendants for, in addition to all previous requests for relief:

1.	All of Plaintiff's attorneys' fees and costs sustained because of Genuine Lifetime's default under the Securities Agreement.

2.	An immediate foreclosure on all assets of Genuine Lifetime, including all of its stock holdings in BEN AI as required under the Securities Agreement.

3.	An injunction which prohibits Genuine Lifetime from selling any of its assets, as all of its assets are subject to the Securities Agreement.

4.	That all Plaintiff's investment in BEN AI be immediately returned, plus 6% interest, as a result of Defendants' Securities Fraud.

5.	Punitive damages relating to Defendants intentional scheme to defraud Plaintiff.

6.	Such other relief as this Court may deem just and equitable.


DATED this 21st day of January, 2025.

> _/s/ Robert J. Walker_____
> Robert J. Walker (7-4715)
> Walker Law, LLP
> 114 East 7th Avenue, Suite 200
> P.O. Box 22409
> Cheyenne, WY   82003
> (307) 529-2255 telephone
>
> ATTORNEY FOR PLAINTIFF