Timothy M. Stubson (No. 6-3144)
Brandon E. Pryde (No. 8-6883)
Crowley Fleck PLLP
111 W. 1st Street, Suite 220
Casper, WY 82601
(307) 265-2279
tstubson@crowleyfleck.com
bpryde@crowleyfleck.com
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| AFG Companies, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 25-104 |
| | ) | |
| GENUINE LIFETIME LLC, a Wyoming | ) | |
| Limited Liability Company; BRAND | ) | |
| ENGAGEMENT NETWORK INC., a Wyoming | ) | |
| For Profit Corporation, d/b/a BEN AI, d/b/a BEN, | ) | |
| f/k/a BLOCKCHAIN EXCHANGE NETWORK | ) | |
| INC.; OCTOBER 3RD HOLDINGS, LLC, a | ) | |
| Wyoming Limited Liability Company; MICHAEL | ) | |
| LUCAS, individually; TYLER LUCK, individually, | ) | |
| DUE FIGLIE, LLC, a Wyoming Limited Liability | ) | |
| Company, SHAWN LUCAS, individually, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS

COMES NOW Defendants Genuine Lifetime LLC ("Genuine"), Brand Engagement

Network Inc. ("BEN"), October 3rd Holdings, LLC ("October"), Michael Lucas and Due Figlie,

## EXHIBIT 1

LLC ("Figlie") (collectively "Defendants"), through their counsel, Crowley Fleck PLLP, answers the Plaintiff's *Complaint* as follows:

## PARTIES, JURISDICTION,  AND VENUE

1. In answering paragraph 1 of Plaintiff's *Complaint*, Defendants are without sufficient information or belief to admit or deny the allegations of paragraph 1 and, therefore, denies the same.

2. In answering paragraph 2 of Plaintiff's *Complaint*, Defendants admit the allegations of paragraph 2.

3. In answering paragraph 3 of Plaintiff's *Complaint*, Defendants admit that BEN is a Wyoming corporation. Defendants deny the remaining allegations contained therein.

4. In answering paragraph 4 of Plaintiff's *Complaint*, Defendants admit that October is a Wyoming limited liability company. Defendants further admit that Michael Lucas and Tyler Luck are the sole members of October. Defendants deny the remaining allegations contained in Paragraph 4.

5. In answering paragraph 5 of Plaintiff's *Complaint*, Defendants note that the allegations do not relate to any of the answering Defendants.  To the extent the allegations relate to the answering Defendants, they are denied.

6. In answering paragraph 6 of Plaintiff's *Complaint*, Defendants deny the allegations contained therein.

7. In answering paragraph 7 of Plaintiff's *Complaint*, Defendants admit the allegations of Paragraph 7.

8. In answering paragraph 8 of Plaintiff's *Complaint*, Defendants admit that Shawn and Michael Lucas are brothers. Defendants further admit that Shawn Lucas formed Due Figlie in

June 2020, and is the managing member of Due Figlie. Defendants deny the remaining allegations contained in Paragraph 8.

9. In answering paragraph 9 of Plaintiff's *Complaint*, Defendants admits that Travis Gates was employed by AFG. Defendants are without sufficient information or belief to admit or deny the remaining allegations of paragraph 9 and, therefore, deny the same.

10. In answering paragraph 10 of Plaintiff's *Complaint*, Defendant note that the paragraph states legal arguments which require no answer. To the extent paragraph 10 states facts requiring an answer they are denied.

11. In answering paragraph 11 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 11.

12. In answering paragraph 12 of Plaintiff's *Complaint*, Defendants note that paragraph 12 states legal conclusions which require no answer. To the extent paragraph 12 alleges facts requiring an answer they are denied.

13. In answering paragraph 13 of Plaintiff's *Complaint*, Defendants notes that paragraph 13 states legal conclusions which require no answer. To the extent paragraph 13 alleges facts requiring an answer they are denied.

14. In answering paragraph 14 of Plaintiff's *Complaint*, Defendants notes that paragraph 14 states legal conclusions which require no answer. To the extent paragraph 14 alleges facts requiring an answer they are denied.

## FACTS COMMON TO PLAINTIFF'S CLAIMS FOR RELIEF

15. In answering paragraph 15 of Plaintiff's *Complaint*, Defendants admit the allegations of paragraph 15.

16. In answering paragraph 16 of Plaintiff's *Complaint*, Defendants admit the allegations of paragraph 16.

17. In answering paragraph 17 of Plaintiff's *Complaint*, Defendants are without sufficient information or belief to admit or deny the allegations of paragraph 17 and, therefore, deny the same.

18. In answering paragraph 18 of Plaintiff's *Complaint*, Defendants are without sufficient information or belief to admit or deny the allegations of paragraph 18 and, therefore, deny the same.

19. In answering paragraph 19 of Plaintiff's *Complaint*, Defendants are without sufficient information or belief to admit or deny the allegations of paragraph 19 and, therefore, deny the same.

20. In answering paragraph 20 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 20.

21. In answering paragraph 21 of Plaintiff's *Complaint*, Defendants admit that a letter of intent ("LOI") was agreed to for the acquisition of AFG. Defendants deny the remaining allegations contained in paragraph 21.

22. In answering paragraph 22 of Plaintiff's *Complaint*, admit that the acquisition did not occur. Defendants further state that the exclusive reseller agreement speaks for itself, and Defendants deny Paragraph 22 to the extent that its representation of the exclusive reseller agreement is incomplete or inconsistent with the full language of the agreement. Any remaining allegations in paragraph 22, if any, are denied.

23. In answering paragraph 23 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 23.

24.     In answering paragraph 24 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 24.

25.     In answering paragraph 25 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 25.

26.     In answering paragraph 26 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 26.

27.     In answering paragraph 27 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 27.

28.     In answering paragraph 28 of Plaintiff's *Complaint*, Defendants states that the Exclusive Reseller Agreement speaks for itself, and Defendants deny Paragraph 28 to the extent that its representation of the Exclusive Reseller Agreement is incomplete or inconsistent with the full language of the agreement.

29.     In answering paragraph 29 of Plaintiff's *Complaint*, Defendants states that the Exclusive Reseller Agreement speaks for itself, and Defendants deny Paragraph 29 to the extent that its representation of the Exclusive Reseller Agreement is incomplete or inconsistent with the full language of the agreement.

30.     In answering paragraph 30 of Plaintiff's *Complaint*, Defendants states that the Exclusive Reseller Agreement speaks for itself, and Defendants deny Paragraph 30 to the extent that its representation of the Exclusive Reseller Agreement is incomplete or inconsistent with the full language of the agreement.

31.     In answering paragraph 31 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 31.

32.    In answering paragraph 32 of Plaintiff's *Complaint*, Defendants states that the Exclusive Reseller Agreement speaks for itself, and Defendants deny Paragraph 32 to the extent that its representation of the Exclusive Reseller Agreement is incomplete or inconsistent with the full language of the agreement.

33.    In answering paragraph 33 of Plaintiff's *Complaint*, Defendants states that the Exclusive Reseller Agreement speaks for itself, and Defendants deny Paragraph 33 to the extent that its representation of the Exclusive Reseller Agreement is incomplete or inconsistent with the full language of the agreement.

34.    In answering paragraph 34 of Plaintiff's *Complaint*, Defendants states that the Exclusive Reseller Agreement speaks for itself, and Defendants deny Paragraph 34 to the extent that its representation of the Exclusive Reseller Agreement is incomplete or inconsistent with the full language of the agreement.

35.    In answering paragraph 35 of Plaintiff's *Complaint*, Defendants admit that AFG entered the First Subscription Agreement. Defendants deny the remaining allegations of paragraph 35.

36.    In answering paragraph 36 of Plaintiff's *Complaint*, Defendants states that the Second Subscription Agreement speaks for itself, and Defendants deny Paragraph 36 to the extent that its representation of the Second Subscription Agreement is incomplete or inconsistent with the full language of the agreement.

37.    In answering paragraph 37 of Plaintiff's *Complaint*, Defendants states that the Second Subscription Agreement speaks for itself, and Defendants deny Paragraph 37 to the extent that its representation of the Second Subscription Agreement is incomplete or inconsistent with the full language of the agreement.

38. In answering paragraph 38 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 38.

39. In answering paragraph 39 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 39.

40. In answering paragraph 40 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 40.

41. In answering paragraph 41 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 41.

42. In answering paragraph 42 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 42.

43. In answering paragraph 43 of Plaintiff's *Complaint*, Defendants are without sufficient information or belief to admit or deny the allegations of paragraph 43 and, therefore, denies the same.

44. In answering paragraph 44 of Plaintiff's *Complaint*, Defendants are without sufficient information or belief to admit or deny the allegations of paragraph 44 and, therefore, denies the same.

45. In answering paragraph 45 of Plaintiff's *Complaint*, Defendants are without sufficient information or belief to admit or deny the allegations of paragraph 45 and, therefore, denies the same.

46. In answering paragraph 46 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 46.

47. In answering paragraph 47 of Plaintiff's *Complaint*, Defendants admit that Travis Gates was President of AFG Technologies, LLC at the time of the ransomware attack. Defendants

are without sufficient information or belief to admit or deny the remaining allegations of paragraph 47 and, therefore, denies the same.

48. In answering paragraph 45 of Plaintiff's *Complaint*, Defendants are without sufficient information or belief to admit or deny the allegations of paragraph 45 and, therefore, denies the same.

49. In answering paragraph 49 of Plaintiff's *Complaint*, Defendants admit that Shawn Lucas led a technology summit relating to BEN Auto. Defendants deny the remaining allegations of paragraph 49.

50. In answering paragraph 50 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 50.

51. In answering paragraph 51 of Plaintiff's *Complaint*, Defendants admit the allegations of paragraph 51.

52. In answering paragraph 52 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 52.

53. In answering paragraph 53 of Plaintiff's *Complaint*, Defendants states that the Loan Agreement speaks for itself, and Defendants deny Paragraph 53 to the extent that its representation of the Loan Agreement is incomplete or inconsistent with the full language of the agreement.

54. In answering paragraph 54 of Plaintiff's *Complaint*, Defendants states that the Loan Agreement speaks for itself, and Defendants deny Paragraph 54 to the extent that its representation of the Loan Agreement is incomplete or inconsistent with the full language of the agreement.

55. In answering paragraph 55 of Plaintiff's *Complaint*, Defendants states that the Loan Agreement speaks for itself, and Defendants deny Paragraph 55 to the extent that its representation of the Loan Agreement is incomplete or inconsistent with the full language of the agreement.

56. In answering paragraph 56 of Plaintiff's *Complaint*, Defendants states that the Loan Agreement speaks for itself, and Defendants deny Paragraph 56 to the extent that its representation of the Loan Agreement is incomplete or inconsistent with the full language of the agreement.

57. In answering paragraph 57 of Plaintiff's *Complaint*, Defendants states that the Loan Agreement speaks for itself, and Defendants deny Paragraph 57 to the extent that its representation of the Loan Agreement is incomplete or inconsistent with the full language of the agreement.

58. In answering paragraph 58 of Plaintiff's *Complaint*, Defendants states that the Loan Agreement speaks for itself, and Defendants deny Paragraph 58 to the extent that its representation of the Loan Agreement is incomplete or inconsistent with the full language of the agreement.

59. In answering paragraph 59 of Plaintiff's *Complaint*, Defendants states that the Loan Agreement speaks for itself, and Defendants deny Paragraph 59 to the extent that its representation of the Loan Agreement is incomplete or inconsistent with the full language of the agreement.

60. In answering paragraph 60 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 60.

61. In answering paragraph 61 of Plaintiff's *Complaint*, Defendants admit that AFG has filed a prior lawsuit in Tarrant County, Texas, alleging Genuine Lifetime and Luck defaulted on the Loan Agreement. Defendants affirmatively state that that previous lawsuit, and this lawsuit in Teton County, Wyoming, only occurred after Defendants filed multiple lawsuits against AFG.

62. In answering paragraph 62 of Plaintiff's *Complaint*, Defendants states that the Personal Guarantee speaks for itself, and Defendants deny Paragraph 62 to the extent that its representation of the Personal Guarantee is incomplete or inconsistent with the full language of the agreement.

63. In answering paragraph 63 of Plaintiff's *Complaint*, Defendants states that the Personal Guarantee speaks for itself, and Defendants deny Paragraph 63 to the extent that its representation of the Personal Guarantee is incomplete or inconsistent with the full language of the agreement.

64. In answering paragraph 64 of Plaintiff's *Complaint*, Defendants admit that Luck and AFG entered into the Lock-Up Agreement. Defendants deny the remaining allegations of paragraph 64.

65. In answering paragraph 65 of Plaintiff's *Complaint*, Defendants states that the Lock-Up Agreement speaks for itself, and Defendants deny Paragraph 65 to the extent that its representation of the Lock-Up Agreement is incomplete or inconsistent with the full language of the agreement.

66. In answering paragraph 66 of Plaintiff's *Complaint*, Defendants states that the Lock-Up Agreement speaks for itself, and Defendants deny Paragraph 66 to the extent that its representation of the Lock-Up Agreement is incomplete or inconsistent with the full language of the agreement.

67. In answering paragraph 67 of Plaintiff's *Complaint*, Defendants admit that Genuine Lifetime and AFG entered a Security Agreement. Defendants deny the remaining allegations of paragraph 67.

68. In answering paragraph 68 of Plaintiff's *Complaint*, Defendants states that the Security Agreement speaks for itself, and Defendants deny Paragraph 68 to the extent that its representation of the Security Agreement is incomplete or inconsistent with the full language of the agreement.

69.     In answering paragraph 69 of Plaintiff's *Complaint*, Defendants states that the Security Agreement speaks for itself, and Defendants deny Paragraph 69 to the extent that its representation of the Security Agreement is incomplete or inconsistent with the full language of the agreement.

70.     In answering paragraph 70 of Plaintiff's *Complaint*, Defendants states that the Security Agreement speaks for itself, and Defendants deny Paragraph 70 to the extent that its representation of the Security Agreement is incomplete or inconsistent with the full language of the agreement.

71.     In answering paragraph 71 of Plaintiff's *Complaint*, Defendants states that the Security Agreement speaks for itself, and Defendants deny Paragraph 71 to the extent that its representation of the Security Agreement is incomplete or inconsistent with the full language of the agreement.

72.     In answering paragraph 72 of Plaintiff's *Complaint*, Defendants states that the Security Agreement speaks for itself, and Defendants deny Paragraph 72 to the extent that its representation of the Security Agreement is incomplete or inconsistent with the full language of the agreement.

73.     In answering paragraph 73 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 73.

74.     In answering paragraph 74 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 74.

75.     In answering paragraph 75 of Plaintiff's *Complaint*, Defendants admit that BEN AI has gone through some leadership changes.  Defendants deny the remaining allegations of paragraph 75.

76.     In answering paragraph 76 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 76.

77.     In answering paragraph 77 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 77.

78.     In answering paragraph 78 of Plaintiff's *Complaint*, Defendants admit the allegations of paragraph 78.

79.     In answering paragraph 79 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 79.

80.     In answering paragraph 80 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 80.

81.     In answering paragraph 81 of Plaintiff's Complaint, Defendants are without sufficient information or belief to admit or deny the allegations of paragraph 81 and, therefore, deny the same.

82.     In answering paragraph 82 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 82.

83.     In answering paragraph 83 of Plaintiff's *Complaint*, Defendants are without sufficient information or belief to admit or deny the allegations of paragraph 83 and, therefore, deny the same.

84.     In answering paragraph 84 of Plaintiff's Complaint, Defendants are without sufficient information or belief to admit or deny the allegations of paragraph 84 and, therefore, deny the same.

85.     In answering paragraph 85 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 85.

86.     In answering paragraph 86 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 86.

87.     In answering paragraph 87 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 87.

88.     In answering paragraph 88 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 88.

89.     In answering paragraph 89 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 89.

90.     In answering paragraph 90 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 90.

91.     In answering paragraph 91 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 91.

92.     In answering paragraph 92 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 92.

93.     In answering paragraph 93 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 93.

94.     In answering paragraph 94 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 94.

95.     In answering paragraph 95 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 95.

96.     In answering paragraph 96 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 96.

97.    In answering paragraph 97 of Plaintiff's *Complaint*, Defendants deny that BEN sent AFG a letter indicating that it was terminating the Exclusive Reseller Agreement. Defendants deny the remaining allegations of paragraph 97.

98.    In answering paragraph 98 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 98.

99.    In answering paragraph 99 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 99.

## FIRST CAUSE OF ACTION AGAINST DEFENDANTS GENUINE LIFETIME AND OCTOBER 3RD HOLDINGS: - BREACH LOCK-UP AGREEMENT, and SECURITY AGREEMENT

100.    Defendants restate and reallege each answer found in paragraphs 1-99 above.

101.    In answering paragraph 101 of Plaintiff's *Complaint*, Defendants notes that paragraph 101 states legal conclusions which require no answer. To the extent paragraph 101 alleges facts requiring an answer they are denied.

102.    In answering paragraph 102 of Plaintiff's *Complaint*, Defendants notes that paragraph 102 states legal conclusions which require no answer. To the extent paragraph 102 alleges facts requiring an answer they are denied.

103.    In answering paragraph 103 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 103.

104.    In answering paragraph 104 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 104.

105.    In answering paragraph 105 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 105.

106.    In answering paragraph 106 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 106. Defendants further affirmatively allege that Plaintiffs are not entitled to the assets and Luck has no liability under the personal guaranty.

107.    In answering paragraph 107 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 107.

108.    In answering paragraph 108 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 108.

**SECOND CAUSE OF ACTION AGAINST DEFENDANTS
GENUINE LIFETIME, TYLER LUCK, AND OCTOBER 3RD HOLDINGS:
-BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING-**

109.    Defendants restate and reallege each answer found in paragraphs 1-108 above.

110.    In answering paragraph 110 of Plaintiff's *Complaint*, Defendants notes that paragraph 110 states legal conclusions which require no answer. To the extent paragraph 110 alleges facts requiring an answer they are denied.

111.    In answering paragraph 111 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 111.

112.    In answering paragraph 112 of Plaintiff's *Complaint*, Defendants admit AFG paid Genuine Lifetime $4,000,000, but states that the Security Agreement, Personal Guarantee, and Lock-Up Agreements speak for themselves, and Defendants deny Paragraph 112 to the extent that its representation of the agreements are incomplete or inconsistent with the full language of the agreements.

113.    In answering paragraph 113 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 113.

114.    In answering paragraph 114 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 114.

115.    In answering paragraph 115 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 115.

116.    In answering paragraph 116 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 116.

117.    In answering paragraph 117 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 117.

**THIRD CAUSE OF ACTION AGAINST
DEFENDANTS GENUINE LIFETIME AND OCTOBER 3RD HOLDINGS:
-UCC FORECLOSURE ON COLLATERAL OF BEN AI STOCK-**

118.    Defendants restate and reallege each answer found in paragraphs 1-117 above.

119.    In answering paragraph 119 of Plaintiff's *Complaint*, Defendants notes that paragraph 119 states legal conclusions which require no answer. To the extent paragraph 119 alleges facts requiring an answer they are denied.

120.    In answering paragraph 120 of Plaintiff's *Complaint*, Defendants are without sufficient information or belief to admit or deny the allegations of paragraph 120 and, therefore, denies the same.

121.    In answering paragraph 121 of Plaintiff's *Complaint*, Defendants state that the Loan Agreement and Security Agreement speak for themselves, and Defendants deny Paragraph 121 to the extent that its representation of the agreements is incomplete or inconsistent with the full language of the agreements.

122.    In answering paragraph 122 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 122.

**FOURTH CAUSE OF ACTION AGAINST DEFENDANTS
GENUINE LIFETIME, OCTOBER 3rd HOLDINGS,
MICHAEL LUCAS, SHAWN LUCAS, TYLER LUCK, and DUE FIGLIE:
- UNJUST ENRICHMENT –**

123.    In answer paragraphs 123 through 134, the Defendants note that the unjust enrichment claims have been dismissed, and these paragraphs require no response. To the extent paragraphs 123 through 134 require a response, they are denied.

**FIFTH CAUSE OF ACTION AGAINST
DEFENDANTS LUCK, SHAWN LUCAS, DUE FIGLIE, and MICHAEL LUCAS:
- TORTIOUS INTERFERENCE WITH A CONTRACT**

124.    Defendants restate and reallege each answer found in paragraphs 1-134 above.

125.    In answering paragraph 136 of Plaintiff's *Complaint*, Defendants notes that paragraph 136 states legal conclusions which require no answer. To the extent paragraph 136 alleges facts requiring an answer they are denied.

126.    In answering paragraph 137 of Plaintiff's *Complaint*, Defendants admit the allegations of paragraph 137.

127.    In answering paragraph 138 of Plaintiff's *Complaint*, Defendants admit the allegations of paragraph 138.

128.    In answering paragraph 139 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 139.

129.    In answering paragraph 140 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 140.

130.    In answering paragraph 141 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 141.

131.    In answering paragraph 142 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 142.

132.    In answering paragraph 143 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 143.

133.    In answering paragraph 144 of Plaintiff's *Complaint*, Defendants admit that the Reseller Agreement has been terminated.  Defendants deny the remaining allegations of paragraph 144.

134.    In answering paragraph 145 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 145.

135.    In answering paragraph 146 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 146.

136.    In answering paragraph 147 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 147.

**SIXTH CAUSE OF ACTION AGAINST DEFENDANTS
GENUINE LIFETIME, OCTOBER 3RD, TYLER LUCK,
SHAWN LUCAS, DUE FIGLIE and MICHAEL LUCAS:
- CIVIL CONSPIRACY TO COMMIT FRAUD -**

137.    In answer paragraphs 148 through 173, the Defendants note that the unjust enrichment claims have been dismissed, and these paragraphs require no response. To the extent paragraphs 148 through 173 require a response, they are denied.

**SEVENTH CAUSE OF ACTION AGAINST DEFENDANTS
GENUINE LIFETIME, OCTOBER 3RD, TYLER LUCK,
SHAWN LUCAS, DUE FIGLIE, and MICHAEL LUCAS:
- FRAUD AND CONSTRUCTIVE FRAUD -**

138.   In answer paragraphs 174 through 198, the Defendants note that the unjust enrichment claims have been dismissed, and these paragraphs require no response. To the extent paragraphs 174 through 198 require a response, they are denied.

**EIGHTH CAUSE OF ACTION AGAINST DEFENDANTS**
**GENUINE LIFETIME, LUCK, BEN AI,**
**OCTOBER 3RD HOLDINGS, and MICHAEL LUCAS:**
**-SECURITIES FRAUD PURSUANT TO W.S. §17-4-501-**

139.   In answer paragraphs 199 through 219, the Defendants note that the unjust enrichment claims have been dismissed, and these paragraphs require no response. To the extent paragraphs 199 through 219 require a response, they are denied.

**NINTH CAUSE OF ACTION AGAINST DEFENDANTS**
**BEN AI, GENUINE LIFETIME, TYLER LUCK, AND OCTOBER 3RD HOLDINGS:**
**- INJUNCTIVE RELIEF -**

140.   Defendants restate and reallege each answer found in paragraphs 1-139 above.

141.   In answering paragraph 221 of Plaintiff's *Complaint*, Defendants notes that paragraph 221 states legal conclusions which require no answer. To the extent paragraph 221 alleges facts requiring an answer they are denied.

142.   In answering paragraph 222 of Plaintiff's *Complaint*, Defendants notes that paragraph 222 states legal conclusions which require no answer. To the extent paragraph 222 alleges facts requiring an answer they are denied.

143.   In answering paragraph 223 of Plaintiff's *Complaint*, Defendants notes that paragraph 223 states legal conclusions which require no answer. To the extent paragraph 221 alleges facts requiring an answer they are denied.

144.   In answering paragraph 224 of Plaintiff's *Complaint*, Defendants notes that paragraph 224 states legal conclusions which require no answer. To the extent paragraph 224 alleges facts requiring an answer they are denied.

**TENTH CAUSE OF ACTION AGAINST DEFENDANTS
BEN AI, TYLER LUCK, SHAWN LUCAS, AND MICHAEL LUCAS:
-BUSINESS DEFAMATION and BUSINESS DEFAMATION PER SE-**

145.    In answer paragraphs 225 through 237, the Defendants note that the unjust enrichment claims have been dismissed, and these paragraphs require no response. To the extent paragraphs 225 through 237 require a response, they are denied.

**DAMAGES**

146.    In answering paragraph 238 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 238.

147.    In answering paragraph 239 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 239.

148.    In answering paragraph 240 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 240.

149.    In answering paragraph 241 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 241.

150.    In answering paragraph 242 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 242.

151.    In answering paragraph 243 of Plaintiff's *Complaint*, Defendants deny the allegations of paragraph 243.

152.    To the extent any allegation made in Plaintiff's *Complaint* has not been specifically admitted or denied in the paragraphs above, they are hereby denied.

**ANSWER TO REQUEST FOR RELIEF**

Answering the Plaintiff's request for relief, Defendants deny that judgment should be entered in favor of Plaintiff, and further denies that relief requested should be granted.

## AFFIRMATIVE DEFENSES

1. Plaintiff fails, in whole or in part, to state a claim upon which relief can be granted.

2. Plaintiff's claims are barred, in whole or in part, by the doctrines of unclean hands, ratification, waiver, or estoppel.

3. Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations.

4. Defendants assert that they are not liable to Plaintiff because the agreements described in Plaintiff's Complaint were the product of fraud.

5. Defendants assert that performance under the agreements was excused because performance was impossible of impracticable.

6. Defendants are not liable to Plaintiff because the agreements described in Plaintiff's Complaint were void against public policy.

7. Plaintiff failed to mitigate its damages.

8. The various agreements mentioned above entitles Defendants as the prevailing party to the costs and fees incurred in defending this action.

9. Defendants reserve the right to assert additional affirmative defenses as may be disclosed during the course of additional investigation and discovery.

WHEREFORE, Defendants requests that Plaintiff take nothing by its claims for relief and that Defendants be given judgment dismissing Plaintiff's *Complaint* and awarding Defendant its costs, disbursements, and fees, along with any other relief deemed just and equitable.

## COUNTERCLAIMS

Counterclaimants Genuine Lifetime LLC, October 3rd Holdings, LLC, and Due Figlie, LLC, (collectively "Counterclaimants") assert the following counterclaims against Counter-Defendant AFG Companies Inc. ("AFG" or "Counter-Defendant") and in sets forth as Counter

Claimant and states the following counterclaims against Counter Defendant AFG Companies Inc. ("AFG" or "Counter-Defendant") as follows:

1.      Genuine Lifetime is a limited liability company formed in the State of Wyoming.

2.      Tyler Luck is a natural person domiciled in the State of Wyoming, and he is a Wyoming citizen.

3.      October 3rd Holdings, LLC, is a limited liability company. It is comprised of two members: (a) Tyler Luck, a natural person domiciled in the State of Wyoming, and (b) Michael Lucas, a natural person domiciled in the State of California. Accordingly, October 3rd Holdings, LLC is a citizen of the states of Wyoming and California.

4.      Brand Engagement Network, Inc. ("BEN"), is a Wyoming corporation.

5.      Due Figlie, LLC, is a Wyoming limited liability company.

6.      Shawn Lucas, is a California resident and a member of Due Figlie LLC.

7.      AFG Companies, Inc. ("AFG"), a Texas corporation, is a citizen of the State of Texas because AFG was incorporated in the State of Texas, and Texas is the state where AFG has its principal place of business. The address of its headquarters and the place where AFG's officers direct, control, and coordinate its corporate activities is 1900 Champagne Blvd., Grapevine, Texas 76051.

8.      AFG was the primary counterparty to the Exclusive Reseller Agreement and failed to fulfill its contractual obligations by concealing the ransomware attack and breaching its data security and performance requirements.

9.      Genuine Lifetime is a company engaged in providing technology solutions, extended warranty coverage programs, lifetime limited warranties, and service contracts for automotive manufacturers, automotive dealers, parts distributors, tire distributors, wholesale clubs,

retail locations, third party software solution providers, ecommerce platforms, independent repair facilities, and collision repair facilities.

10.    Over the years, Genuine Lifetime has established prosperous business relationships with major automotive dealerships located in the United States, including titans Mercedes Benz U.S.A. ("**MBUSA**") and Southeast Toyota Distributors ("**SET**").[1] Using these industry connections, Genuine Lifetime successfully *brokers* major service contracts between automotive dealerships and TPAs that Genuine Lifetime has developed working relationships with. These brokered transactions are made pursuant to a binding broker agreement between Genuine Lifetime and its TPAs entered at the outset. Importantly, these broker agreements contain Performance Award Programs ("**PAP**") whereby Genuine Lifetime derives its primary ongoing source of income. The PAPs in each broker agreement obligate the TPA to split proceeds from sales of brokered service contracts with dealerships with Genuine Lifetime during periods where the sales are highly profitable.

11.    Genuine Lifetime first began doing business with CareGard and its parent company AFG in 2020. In January of 2020 Genuine Lifetime brokered a program between MBUSA and CareGard, whereby CareGard (as TPA) would administer some of Genuine Lifetime's lifetime limited warranties. This initial three-party program was limited to the sale and administration of Genuine Lifetime's warranties for wiper blades on vehicles at MBUSA's dealerships. Genuine Lifetime and CareGard agreed to a PAP, and both parties began dutifully performing under the terms of that PAP with positive results.

12.    Over the next two years, the MBUSA program proved to be a profitable and mutually enjoyable arrangement between Genuine Lifetime and CareGard.

---

[1] SET is a group of over 175 Toyota dealerships in various Southern states.

13.    On August 3, 2022, Genuine Lifetime and CareGard entered into a Broker, Marketing, Product, and License Agreement (the "**Original Broker Agreement**"). Under the Original Broker Agreement, Genuine Lifetime and CareGard agreed to replace and supersede all prior contracts, and entered into a new binding agreement with an indefinite term for all warranty programs going forward. The Original Broker Agreement contained thirty-nine pages of overarching terms, and included an updated Statement of Work ("**SOW**") for all the MBUSA and SET warranty programs.

14.    The Original Broker Agreement and each of these SOWs contained uniform PAP terms.

15.    Additionally, the Original Broker Agreement obligated CareGard to pay Genuine Lifetime a fee for each automotive warranty contract successfully issued to the dealership. The amount of each fee varied depending on the program and SOW, but in the Original Broker Agreement a range of "a minimum of $0.50 cents (US$) up to a maximum of $6.75 (US$) per Contract issued" was provided.

16.    The term of the Original Broker Agreement is indefinite. Wright Brewer personally signed the Original Broker Agreement on August 3, 2022, and the contract became fully executed and binding.

17.    From there, Genuine Lifetime introduced CareGard to SET and brokered the Lifetime Limited Warranty Program Master Services Agreement, dated November 2, 2022, between CareGard & SET. SOWs between CareGard and SET followed soon thereafter, and a new Genuine Lifetime-CareGard-SET business relationship began.

18.    BEN was formed in 2018 to create powerful AI assistants capable of improving the various industries including the automotive and heath care industries.

19.     In the automotive industry BEN's technology was designed to be a customer-facing AI assistant that could increase dealership sales, improve data management systems, and lower labor costs.

20.     In or around June of 2023, BEN filed a business registration application in the State of Texas, with the intention of transacting business with dealerships in this State. Around this time, BEN also began a securities transaction with Genuine Lifetime, whereby BEN issued 500,000 shares of Class B Common Stock in BEN to Genuine Lifetime with certificate number CSB-79.

21.     Upon learning about BEN through his business relationship with Genuine Lifetime, AFG, through Wright Brewer, became interested in BEN's AI technology.

22.     AFG, through Brewer, informed his contacts at Genuine Lifetime that he wanted to integrate BEN's AI technology into CareGard's TPA systems and into the systems of his other business entities, including the entity that wholly owns CareGard: AFG Companies, Inc.

23.     Brewer represented that AFG had a valuable database with a large volume of secure customer data that could leverage BEN's AI technology. AFG, through Brewer, assured BEN and Genuine Lifetime that AFG's databases were fully operational, compliant with data security standards, and capable of legally integrating BEN's AI-powered customer engagement solutions technology.

24.     After negotiations between Genuine Lifetime, AFG, and BEN, on or about August 18, 2023, Genuine Lifetime and CareGard agreed upon and signed a First Amendment to their Original Broker Agreement (the "**First Amended Broker Agreement**"). This amendment made a few material changes to the Original Broker Agreement entered into on August 9, 2022.

25.     First, it modified Genuine Lifetime's compensation structure slightly so that Genuine Lifetime's fee from each contract issued to the dealership was lowered from $0.50 cents

to $0.25 cents. Second, the amendment added CareGard's parent company, AFG, as a party and signatory to the broker deal. Third, the deal was modified to add an acknowledgement that the certificate of 500,000 shares of BEN shares originally issued to Genuine Lifetime would be transferred to Brewer and his relatives.

26.      Apart from a few other minor changes, the terms of the Original Broker Agreement expressly remained in full force and effect.

27.      The following day, on August 19, 2023, BEN and AFG entered into a bilateral Exclusive Reseller Agreement ("**ERA**" or "**Reseller Agreement**"). The ERA is a professional services contract whereby AFG and all its subsidiaries (including CareGard) would integrate BEN's innovative AI technology into all ongoing dealership systems, including the major dealer agreements in place with Genuine Lifetime.

28.      As a part of the Reseller Agreement, AFG promised it would invest a substantial amount of cash in BEN annually over the next five years as well as purchase a set number of BEN shares. In exchange, AFG received favorable stock purchase terms, and it was able to deepen its partnership with Genuine Lifetime.

29.      Additionally, because the Reseller Agreement involved BEN's provision of its proprietary AI-technology to AFG, the contract contained several express restrictive covenants of non-competition during the deal's full 5-year term, including a total prohibition on modifying, translating, reverse engineering, or otherwise building products or services to compete with BEN.

30.      Additionally, the Reseller Agreement served to benefit all parties to the already brokered dealer agreements with SET and MBUSA. Therefore, even though Genuine Lifetime was not a party to the Reseller Agreement between BEN and AFG, Genuine Lifetime was a notable beneficiary with an expectation interest and was involved in negotiating the ERA.

31.     On September 7, 2023, BEN further executed a Subscription Agreement with AFG (the "**Subscription Agreement**") to facilitate the future issuance, purchase, and delivery of an additional 650,000 initial shares of BEN common stock. As consideration, AFG was required to make payment of $6.5 million to BEN, due on March 13, 2025, as the first of four consecutive yearly installments for a total investment into BEN of $32.5 million.

32.     The Subscription Agreement imposed clear, unconditional, and enforceable financial obligations on AFG, including its irrevocable commitment to purchase Initial Shares and subsequent Installment Shares in accordance with the agreed-upon schedule with no offsets.

33.     By the end of September 2023, BEN had allocated 1.75 million shares of its common stock to AFG, subject to completion of the business combination agreement between BEN and the NASDAQ traded Special Purpose Acquisition Company ("SPAC") called DHC Acquisition Corp which would become NASDAQ traded BNAI in March of 2025.

34.     In October of 2023, BEN sought additional working capital and approached AFG about accelerating a future payment it owed pursuant to the Reseller Agreement.

35.     AFG expressed reluctance to accelerate any upcoming payments, and instead, Brewer stated he was willing to explore "loan possibilities" involving Genuine Lifetime and Tyler Luck.

36.     Genuine Lifetime and Luck entered good-faith negotiations on the "loan possibilities" Brewer was envisioning.

37.     AFG, through Brewer, represented that it would loan $4,000,000 to Genuine Lifetime, to directly purchase shares of BEN, all in order to help BEN meet its need for working capital and to be the catalyst for a successful launch in the automotive industry. During

negotiations, AFG openly represented that the intent for the loan of money was to support BEN and to accommodate BEN's sincere requests for funding.

38.     These negotiations culminated in the October 17, 2023, loan agreement between Genuine Lifetime and AFG (the "**Loan Agreement**").  Under the terms of the Loan Agreement, the parties agreed that AFG would lend to Genuine Lifetime, four million dollars ($4,000,000) upon two conditions: (a) that Genuine Lifetime would use those funds to purchase shares of BEN before it went public, and (b) that Genuine Lifetime would pledge its assets and member interests as collateral for the loan.  Additionally, per Brewer's insistence, Tyler Luck had to agree to personally guarantee the Loan Agreement, which he did through execution of a guaranty agreement on October 17, 2023 (the "**Guaranty**").

39.     On October 17, 2023, both the Loan Agreement and all security agreements, including the Guaranty, were entered. As promised, Genuine Lifetime used the proceeds of the Loan Agreement to purchase 493,333 shares in BEN, making those shares Genuine Lifetime's largest asset.

40.     On March 15, 2024, BEN began trading publicly on the NASDAQ under the symbol **BNAI**.

41.     It was discovered later that AFG and its various entities engaged in a fraudulent scheme for many months, intentionally concealing crucial facts to both subvert and plunder Genuine Lifetime and BEN through the various agreements described above.

42.     The first evidence of AFG's fraudulent scheme can be traced back to at least August of 2023.

43.     Five days before the Original Broker Agreement was amended, and two months prior to any negotiations on the Genuine Lifetime Loan Agreement, AFG had sustained a

massively sweeping data security breach and ransomware attack on August 13, 2023 (the "**Hack**"). The Hack resulted in the involuntary disclosure of an enormous volume of sensitive consumer information—including the information of customers covered under the SET and MBUSA dealer agreements. Despite its systems being completely compromised, AFG told no one about the Hack, despite having a fiduciary and statutory responsibility to do so.

44.    The Hack was conducted by the notorious "ALPHV" group, an affiliate of the BlackCat ransomware organization.

45.    Th Hack rendered AFG's systems inoperable and compromised over 105,000 files, including sensitive consumer and dealership data. AFG's controller, Amanda Tettleton, confirmed that more than 105,000 files on AFG servers and employee workstations, including files containing personal information of customers and individual warranty policy holders, had been compromised and encrypted. "Encrypted" means that a threat actor infiltrated a computer network and changed password and security keys so that only the threat actor (ALPHV) had access to the encrypted files, holding them hostage. Generally—just like here—the threat actor then sends a ransomware note demanding an extortion payment in return for providing the owner with access to its own computer network.

46.    AFG was first notified of the data breach by Integris, a cybersecurity company. Upon learning that there had been a ransomware attack and data breach, AFG's immediate initial response to this data breach was to contact its insurer Cowbell who put AFG in touch with its law firm Mullen & Coughlin as well as Booz Allen, one of the nation's leading cybersecurity organizations. AFG asked Integris to assess the extent of damage and data compromised by the breach. Integris's assessment revealed the damage done by the hack was severe and Booz Allen was going to provide advice for an informed, prudent response.

47.     Instead, AFG dismissed Booz Allen and Integris before the analysis could be completed.

48.     AFG also omitted crucial information about the Hack to Genuine Lifetime and BEN. AFG knew that disclosing the existence of the Hack would have jeopardized its plans with respect to the ERA. Knowingly withholding this crucial information, AFG proceeded to enter into the Reseller Agreement with BEN less than a week later on August 19, 2023. AFG also said nothing to Genuine Lifetime, or Genuine Lifetime's customers SET, or MBUSA about the compromise of their dealership data or their customer's data.

49.     Furthermore, AFG continued to say nothing to Genuine Lifetime or Tyler Luck about the breach before the parties entered the Loan Agreement and Guaranty.

50.     AFG's concealment of the ransomware Hack constituted a material omission that directly induced Genuine Lifetime to enter the Loan Agreement and continue working with AFG. Had Genuine Lifetime been made aware of the attack, it would not have entered into the Loan Agreement or agreed to provide Brewer and his relatives the 500,000 shares of BEN stock originally issued to Genuine Lifetime.

51.     The concealed breach created immediate risks to Genuine Lifetime's relationship with SET and MBUSA, and Genuine Lifetime has suffered damages as a result of this deception.

52.     Furthermore, rather than acting as BEN's ally and reseller, as agreed to in the ERA, AFG immediately embarked on a path to compete against BEN and "slow-roll" any agreements with customers to aid the development of AFG's own competing brand of AI customer service products.

53.     Upon information and belief, as early as October 2023, Brewer explicitly declared in an internal meeting with executive leadership of AFG that AFG was, "going to war" and "had

to own all of this" (referring to the intellectual property of BEN and its AI trade secrets). Around this point in time, after both the Hack had occurred and the terms of the Reseller Agreement had begun, AFG continued to demand access to BEN's source code.

54.    Upon information and belief AFG was creating new competing AI technology platforms known as "Symphonai," "Pathwai," and/or "DaidaX," and engaging in discussions with a different AI company and competitor to BEN, DriveCentric; AI-Driven Automotive Industry Software, to advance their new platform.

55.    Upon information and belief, on March 7, 2024, Brewer convened an executive meeting to conspire with others to compete against BEN. During this meeting, Brewer unveiled a five-year plan centered on creating a new entity, known as "Pathwai," to compete against BEN.

56.    Upon information and belief, according to witnesses at the meeting on March 7, 2024, AFG's President at the time, Jason De Laporte, stated that AFG "*did not have the operational capacity to fulfill the exclusive reseller agreement*" with BEN and planned to violate the exclusivity clauses within the Reseller Agreement.

57.    Upon information and belief, according to witnesses present at the March 7th meeting, Brewer admitted his intention to violate the exclusivity and non-compete provisions of the Reseller Agreement

58.    Neither Genuine Lifetime nor BEN were ever informed of AFG's intention to ignore the Reseller Agreement and directly compete with BEN. Genuine Lifetime nor BEN were ever told about AFG's relationship with another test dealership or AFG's intent not to meet its contractual requirements related to BEN's AI software.

59.     Had Genuine Lifetime known that AFG was planning to directly compete against BEN and ignore its promises to become a collaborative stakeholder in BEN, and resell its technology, Genuine Lifetime would have never entered into the Loan Agreement.

## FIRST COUNTERCLAIM – BREACH OF CONTRACT

60.     Counterclaimant Genuine Lifetime restates and realleges the allegation stated in paragraphs 1-59 above.

61.     The Original Broker Agreement, First Amended Broker Agreement, and Exclusive Reseller Agreement constitutes valid, binding and enforceable contracts.

62.      Genuine Lifetime performed its obligations under the Original Broker Agreement, First Amended Broker Agreement, and Exclusive Reseller Agreement.

63.     AFG has breached the Original Broker Agreement, First Amended Broker Agreement, and Exclusive Reseller Agreement by failing to fulfill its obligations under the agreements.

64.     As a result of AFG's breach of its contractual obligations, Genuine Lifetime has been deprived the benefit of the bargain under the agreements and has suffered substantial financial harm in an amount to be proven at trial.

## SECOND COUNTERCLAIM - BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

65.     Counterclaimant Genuine Lifetime restates and realleges the allegation stated in paragraphs 1-64 above.

66.     The Original Broker Agreement, First Amended Broker Agreement, and Exclusive Reseller Agreement constitutes valid and binding contracts.

67.     The agreements contain an implied covenant of good faith and fair dealing.

68. The implied covenant of good faith and fair dealing required AFG to perform in good faith and consistent with the Original Broker Agreement, First Amended Broker Agreement, and Exclusive Reseller Agreement, and consistent with Genuine Lifetime's justified expectations.

69. The implied covenant of good faith and fair dealing required AFG to refrain from committing any act that would injure Genuine Lifetime's ability to receive the benefit of the various agreements.

70. AFG breached the implied covenant of good faith and fair dealing by refusing to, and/or never planning on, performing its contractual obligations.

71. AFG's breach of the implied covenant of good faith and fair dealing deprived Genuine Lifetime of the benefit of the bargain under the agreements.

72. As a result of AFG's breach of covenant of good faith and fair dealing Genuine Lifetime has suffered substantial financial harm in an amount to be proven at trial.

## THIRD COUNTERCLAIM - TORTIOUS INTERFERENCE WITH CONTRACT AND BUSINESS RELATIONS

73. Counterclaimants Genuine Lifetime, Due Figlie, and October 3rd restates and realleges the allegation stated in paragraphs 1-72 above.

74. The Original Broker Agreement, First Amended Broker Agreement, Subscription Agreement, Loan Agreement and Exclusive Reseller Agreement constitutes valid and binding contracts.

75. Counterclaimants Genuine Lifetime, Due Figlie, and October 3rd had valid contracts with, and/or prospective business relations involving, BEN AI.

76. AFG, by and through its agents and employees, knew or reasonably should have known that Counterclaimants Genuine Lifetime, Due Figlie, and October 3rd had contracts and/or business relations with BEN.

77.     Despite this knowledge, AFG through its agents and employees intentionally interfered with Counterclaimants Genuine Lifetime, Due Figlie, and October 3rd had contracts and/or business relations.

78.     AFG's unlawful conduct has caused substantial financial harm in an amount to be proven at trial.

## PRAYER FOR RELIEF

Wherefore, Counterclaimants Genuine Lifetime, Due Figlie, and October 3rd prays for relief as follows:

a.  Judgment against AFG Companies, Inc. for damages to Genuine Lifetime resulting from AFG Companies, Inc.'s breach of provisions under the Original Broker Agreement, First Amended Broker Agreement, and Exclusive Reseller Agreement in amounts to be proven at trial;

b.  Judgment against AFG Companies, Inc. for damages to Genuine Lifetime resulting from AFG Companies, Inc.'s breach of the implied covenant of good faith and fair dealing in amounts to be proven at trial;

c.  Judgment against AFG Companies, Inc. for its tortious interference with Counterclaimants Genuine Lifetime, Due Figlie, and October 3rd contracts and business relations, in amounts to be proven at trial.

d.  Genuine Lifetime's fees, costs, and attorney fees;

e.  And any other relief the Court may deem proper.

_/s/ Timothy M. Stubson_____
Timothy M. Stubson (WY Bar #6-3144)
Brandon E. Pryde (WY Bar #8-6883)
Crowley Fleck PLLP

112 2nd Street West, Suite 200
(307) 232-6901
tstubson@crowleyfleck.com
bpryde@crowleyfleck.com

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing document was served this 9th day of January 2026, via electronic filing to the following:

Robert J. Walker (7-4715)
Matthew A. Walker (7-5737)
John M. Walker (5-2224)
Walker Law, LLP
114 E. 7th Ave., Suite 200
P.O. Box 22409
Cheyenne, WY 82003
Robert@wyocounsel.com
Matthew@wyocounsel.com
John@wyocounsel.com

/s/ *Timothy M. Stubson*